# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**LIONEL AND TAMMY ALFORD, AS
CO-TRUSTEES OF THE LIONEL
D. ALFORD, JR. AND TAMMY
NIX ALFORD REVOCABLE TRUST,**

        **Plaintiffs,**

**v.**                                **Case No.  3:16cv362/MCR/CJK**

**WALTON COUNTY, A
POLITICAL SUBDIVISION OF THE
STATE OF FLORIDA,**

        **Defendant.**

_____/

## ORDER

In July 2016, Plaintiffs Lionel and Tammy Alford ("Alfords"), who own beachfront property in Walton County, Florida ("County"), brought suit pursuant to 42 U.S.C. § 1983, claiming that certain County regulations pertaining to the dry sand beach on their property violate their free speech rights (Count I) and substantive due process rights (Count II), and seeking declaratory relief. They also raised a state law claim that the regulations are inconsistent with other state statutes (Count III). Specifically, the Alfords challenge recent amendments defining and prohibiting beach "obstructions," *see* Walton Cty. Code. §§ 22-54(g)(2)(a)(3), 22-55 ("Obstruction Amendments"), within an ordinance amending Walton County's

Waterways and Beach Activities Ordinance (Ord. No. 2016-16) (June 14, 2016), codified in Chapter 22 of the Walton County Code.  The Alfords contend that the Obstruction Amendments, which prohibit obstructions on the beach, including "ropes, chains, signs, or fences," effectively prevent them from conveying messages to public beachgoers regarding the boundary of their property, as well as religious and political messages, and preclude them from excluding the general public from their private property.

In October 2016, during the pendency of this case, the County enacted a new ordinance recognizing the public's customary right to use the beaches.[1] *See* Walton Cty. Code Ch. 23, "Customary Use Ordinance" (Ord. No. 2017-10) (amended Mar. 28, 2017, effective April 1, 2017).  In December 2016, the Alfords amended their Complaint to add Count IV, challenging the Customary Use Ordinance and seeking a declaration that the ordinance is *void ab initio* on grounds that customary use is a common law doctrine reserved to the courts for determination on a case-by-case basis, and therefore, the County exceeded its authority and acted *ultra vires* by legislating customary use on a county-wide basis.  The County then agreed to a

---

[1]  The doctrine of "custom" originated in English common law and has been acknowledged by the Florida Supreme Court, noting that "the right of the public of access to, and enjoyment of, Florida's oceans and beaches has long been recognized."  *See City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73 (Fla. 1974).  Although the doctrine of customary use is recognized in Florida, its precise parameters are unclear.  The doctrine has not been established to apply uniformly on a statewide basis; instead, "the specific customary use of the beach in any particular area may vary, [and] proof is required to establish the elements of a customary right."  *Trepanier v. Cty. of Volusia*, 965 So. 2d 276, 289 (Fla. 5th DCA 2007).

preliminary injunction against enforcement of the Obstruction Amendments, and the parties filed the pending summary judgment motions.[2]

Pending before the Court are the Alfords' Motion for Partial Summary Judgment on Count I, on the ground that the Obstruction Amendments violate their First Amendment right to free speech, ECF No. 53, and the County's objection to certain evidence or references by Plaintiffs' counsel with respect to Count I, ECF No. 59. Also pending are cross Motions for Partial Summary Judgment as to Count IV, regarding the validity of the Customary Use Ordinance, ECF Nos. 44, 61. Having fully and carefully considered the arguments, the record, and the applicable law, the Court finds that the Obstruction Amendments violate the First Amendment and thus summary judgment will be granted to the Alfords on Count I, that the County's motion to exclude evidence is moot, and that Counts II and III are also moot in light of the ruling on Count I. Having resolved all of the federal issues, and considering the uniquely state law character of Count IV, the Court declines to exercise supplemental jurisdiction over Count IV, which will be dismissed without prejudice.

---

[2] Early in the suit, the Alfords filed a Motion for Preliminary Injunction based on their First Amendment challenge to the Obstruction Amendments. The Court expedited the trial pursuant to Rule 65 of the Federal Rules of Civil Procedure. Before the scheduled trial, however, after the County adopted the Customary Use Ordinance, the County agreed to a preliminary injunction as to the Obstruction Amendments, and trial was placed back on an ordinary schedule, allowing time for discovery and dispositive motions.

## I.    Background

The Alfords own beachfront property in Walton County, Florida, and their private property extends seaward to the mean high water line, including the dry sand beach.  In the past, they have placed signs on the dry sand area of their property, such as "no trespassing" signs to demarcate the boundary of their private property in an attempt to preserve the private nature of their yard, which includes the dry sand area.[3]  The Alfords plan to continue doing so in the future as well, but they have been notified by the County that, pursuant to the County's regulations regarding use and conduct on the beach, beachfront property owners will be subject to a fine of up to $500 for placing any sign, rope, fence or chain in the dry sand portion of their backyard or for excluding the public from the dry sand area.  The ordinances at issue, i.e., the Obstruction Amendments and the Customary Use Ordinance, while not completely unrelated to each other, are challenged on different grounds, were enacted at different times, and are located in different Chapters of the Walton County Code.

### A.    Obstruction Amendments

The County has regulated waterways in some form since 1982.  *See* Walton Cty. Code, Ord. No. 82-5, § 1 (July 27, 1982).  The current regulation is the Walton

---

[3] In the past, the Alfords have placed signs on their property to "warn against or discourage trespass."  ECF No. 43 at 6.  They have also placed signs on the dry sandy area of the beach in support of political candidates and others with religious messages.

County Waterways and Beach Activities Ordinance ("Beach Activities Ordinance"), Walton Cty. Code Ch. 22, originally adopted in 2013.  The Beach Activities Ordinance, Chapter 22, regulates everything from public boat ramps, no wake zones, and vessel speeds, to animals on the beach, beach vendors, and public beach parking. As relevant here, in 2013, Section 22-54(g) originally required personal property items or obstructions, including "fences, ropes, chains, or signs" to be removed from the beach during overnight hours, but provided for an exception if a permit was obtained from the County Administrator, who had discretion to issue permits, unless the item would be injurious to public health or safety.[4]  *See* § 22-54(g), Ord. No. 2013-04 (2013).  The Obstruction Amendments at issue were added in June 2016, and they altered this permitting section by providing that no permits shall issue for "[o]bstructions, including but not limited to ropes, chains, signs or fences," Walton Cty. Code § 22-54(g)(2)(a)(3), and also making it unlawful to maintain an obstruction on the beach, stating "[o]bstructions include but are not limited to ropes, chains, signs, or fences," Walton Cty. Code § 22-55 (Ord. No. 2016-16).

The public process leading to the enactment of the Obstruction Amendments began on March 16, 2016, when the County held a public workshop on beach access.

---

[4] The 2013 Beach Activities Ordinance also included a section expressly stating, "This chapter makes no finding of fact that the public either has or has not customarily used any particular piece of gulf front property beach."  Sec. 22-52, Ord. No. 2013-04 (2013). This section has since been eliminated and replaced with the Customary Use Ordinance, discussed *infra,* located in Chapter 23, added to the Code in October 2016.

Prior to this workshop, the County had received complaints about the ever-increasing obstructions on the beach, a trend since mid-2015.[5]  The meeting began with a presentation on the law of "customary use" by David A. Theriaque, outside legal counsel for the County.   The public was permitted to comment on the presentation and the issue of beach access.  At the end of the meeting, the Board of County Commissioners (the "Board") directed the County Attorney's Office to "begin changing the beach activities ordinance to address obstructions on the beach."[6]  ECF No. 53-1 at 201.  More specifically, one of the Commissioners, Cecilia Jones, stated that:

> [she] would like to direct staff to work with Mr. Theriaque in coming up with some kind of action, some kind of plan to bring back to us [regarding beach access].  And please include those atrocious fences and those unsightly signs that if a mouse did get caught in our fences he would not live. If a turtle got caught in those fences. And even our public.  We just don't need – aesthetically we don't need those ugly fences.  We don't need those no trespassing signs.

---

[5]  The complaints included, *inter alia,* concerns over aesthetics, confusion about property lines, and hazards on the beach.  There was no official tally of the complaints entered with the County, as they were voiced via emails, telephone, social media, and various public meetings. Brian Kellenberger, Director of Beach Operations, acknowledged during his deposition that not all complainants offered their "pure motivation" for complaining, however.  ECF No. 53-1 at 127. He suggested that "[t]hey will come up to me with all sort [sic] of motivations in order to get a change in behavior by a third party."  *Id.*

[6]  According to Sidney Noyes, the Assistant County Attorney, she was not surprised that the County attorneys were instructed to begin drafting amendments to the beach ordinance because of the large number of complaints the Board had received from the public regarding signs on the beach.  ECF No. 53-1 at 203.

ECF No. 53 at 23.   After the March meeting, Assistant County Attorney Sidney Noyes began drafting proposed amendments to the existing Beach Activities Ordinance.

On June 14, 2016, the County held a public hearing on the proposed Obstruction Amendments.  First, § 22-54(g), previously titled "Obstructions on the Beach," was proposed to be renamed as "Personal property on the beach between one hour after dusk and one hour after sunrise."  While the 2013 version made it unlawful to leave any item on the beach overnight absent a permit and entrusted the County Administrator with discretion to grant permits, the proposed amendment specified, in part, that "[n]o county permit shall be issued for . . . [o]bstructions, including, but not limited to ropes, chains, signs, or fences."  Walton Cty. Code § 22-54(g)(2)(a)(3).  Additionally, a new section was proposed, entitled "Prohibition of obstructions on the beach," which expressly stated that it is unlawful for any person to place an obstruction on the beach and also defines obstructions as:  "Obstructions include, but are not limited to ropes, chains, signs, or fences."  Walton Cty. Code § 22-55.[7]

Property owners who were opposed to the amendments voiced a number of concerns, including that they would be exposed to liability if they could not use signs

---

[7]  This section had previously been designated "reserved."

to prevent the pubic from accessing their property. They also complained that the Sheriff's Office had implemented a Standard Operating Procedure ("SOP") memorandum indicating that state trespassing laws would only be enforced if a beachfront property owner's property line had been surveyed and marked, which could not be done under the ordinance.[8] Thus, the beachfront property owners were concerned that they would no longer have the right to enjoy their property free from trespassers despite paying property taxes. Even those property owners who were in favor of banning obstructions on the beach, such as fences, chains, and ropes, expressed concern about banning all signs because of the Sheriff's SOP memorandum. These property owners suggested that restrictions on the placement, size, and number of signs could still enhance aesthetics and safety, as they had in other areas of the County.[9] Other members of the public supported the proposed amendments as drafted because they would preserve the aesthetics of the beach as

---

[8] The SOP memorandum itself is not part of the record, and neither the Commissioners nor the audience indicated when the SOP was distributed to the public. However, a number of individuals stated they had erected signs and fences on their property in order to comply with the SOP and were concerned that the trespassing laws would not be enforced if they removed them.

[9] The Planning Manager for the Division of Planning and Development Services for the Walton County Board of County Commissioners, Charles M. Carpenter, testified by deposition that Chapter 7 and Chapter 13 of the County's Land Development Code regulate signage. The Chapter 13 regulations pertain only to the County's scenic corridors, which have different restrictions on signs relating to number, size, color, material, and height. Elsewhere in the County, Chapter 7 regulations on signs dictate the height, placement, size, and method of attachment. These regulations also include safety provisions, such as "building setbacks, not being an obstruction to wildlife in wildlife conservation zones, lighting, glare, placement in clear visibility zone for traffic, [and] method of attachment." ECF No. 53-1 at 193.

well as address safety concerns caused by improperly anchored signs, which otherwise could blow into the dunes, injuring children and endangering wildlife.

After hearing public comment, the Board discussed the safety issues regarding children and endangered species,[10] the aesthetics of the beach, the Sheriff's SOP, and the importance of enforcing the County's existing beach activities ordinance.[11] A motion was made to adopt an ordinance banning only fences, chains, and ropes, not signs, because of the concern that if property owners could not erect signs the Sheriff would no longer enforce the trespass laws due to the lack of notice to violators.  This motion was denied.[12]  A second motion was made to adopt the amendments as proposed, including the total sign ban along with the ban of ropes,

---

[10]  Although there was no evidence presented to the Board suggesting that children or endangered species had been harmed by obstructions on the beach in the past, the Board considered public comments that obstructions posed a safety concern because of the risk that they could blow into the dunes and because they are difficult to see at night.

[11]  In depositions, the County's corporate representatives further explained the County's motivations behind the Obstruction Amendments.  Jeffrey McVay, Lead Code Enforcement Officer, said he understood the purpose was to aid in lateral movement along the beach for code enforcement, lifeguards, and emergency response vehicles.  McVay and Kellenberger both testified that the amendments were necessary due to a ruling against the County in another case in which that court found the previous language did not prohibit a chain on the beach because it was merely an "obstruction" and not an "unlawful obstruction."  Moreover, Scott Caraway, Environmental Manger for Public Works, also suggested that the Ordinance would assist the County in complying with its Habitat Conservation Plan ("HCP"), which was adopted to comply with the Endangered Species Act.  Caraway noted that the HCP said "permanent physical structures constructed on the beach or dune can potentially impact sea turtle[s] and beach mice."  ECF No. 53-1 at 176.

[12]  In voting against the motion, Commissioner Jones stated "I'm looking at these signs.  I mean there's [sic] red signs and white signs and big signs and little signs and they all look ugly."  Video Recording of June 14, 2016 Regular Meeting of the Board (ECF No. 55).

chains, and fences, which passed on a vote of three to two.[13]  The final version of Section 22-55, titled "Prohibitions of obstructions on the beach," states:  "It shall be unlawful for any person to place, construct or maintain an obstruction on the beach. Obstructions include, but are not limited to ropes, chains, signs, or fences."  Walton Cty. Code, § 22-55, Ord. No. 2016-16 (June 14, 2016).  This section exempts only sand fences[14] and does not include a definition of "signs."[15]

## B.    Customary Use Ordinance

Four months later, on October 19, 2016, the County held a Customary Use Workshop, with Dr. James Miller, a senior level consultant in archaeology and

---

[13]  In support of adopting the ordinance as proposed, Commissioner Cindy Meadows stated, "I think we need to remove everything and then if we want to add things back into it we can.  But I think it'd be cleaner and easier to remove all things during day and night."  Video Recording of June 14, 2016 Regular Meeting of the Board (ECF No. 55).  She suggested that, once adopted, only then would the Board start looking at the beach in a "comprehensive manner," which would include consideration of all the issues that were discussed at the meeting.  *Id.*  She also noted that removing all obstructions during the day and night was the best option because otherwise the Board would have to try to "parse" up the types of signs on the beach.  *Id.*

[14]  Although not at issue, Section 22-55 provides a sole exemption for sand fences that "have received all necessary permits from state and federal agencies."  Walton Cty. Code § 22-55. Sand fences are defined as "a tool used in dune restoration projects for rebuilding sand dunes." Walton Cty. Code, Ch. 22.

[15]  Noyes testified during her deposition that "signs" could be interpreted to mean anything on the beach that "communicates a message," including but not limited to, "a cooler with a Budweiser sign."  ECF No. 53-1 at 208.  McVay stated that a sign's content was not considered, and that small wedding chalkboards, County signs, vendor sandwich boards, and No Trespassing signs were all "obstructions," although he suggested there was an exception for the posts, ribbons, and signs that demarcate sea turtle nests on the beach.  Kellenberger testified that it is not the signs themselves that are "physical obstructions" to traversing the beach; rather, he suggested that signs with citations to Florida Statutes marking private property were "literal obstruction[s]" to traversing the beach.  ECF No. 53-1 at 118-19.

historic preservation and a former State Archaeologist of Florida, and offered evidence of the public's customary use rights in Walton County. Although the content of Dr. Miller's presentation is not in evidence,[16] the record reflects that the County subsequently held a public hearing on October 25, 2016, to consider a draft ordinance on customary use entitled, "Protecting the Public's Long-Standing Customary Use of the Dry Sand Areas of the Beaches." Ord. No. 2016-23 (Oct. 25, 2016). The ordinance ultimately passed with an effective date of April 1, 2017. The final version declares: "The public's long-standing customary use of the dry sand areas of all of the beaches in the County for recreational purposes is hereby recognized and protected."[17] Walton Cty. Code, § 23-2(a) (Ord. No. 2017-10) (March 28, 2017).[18] In the purpose section of the Customary Use Ordinance, the County observed that "the Florida Supreme Court in *City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73, 73 (Fla. 1974), expressly recognized the doctrine of

---

[16] Apparently, Dr. Miller has prepared a report on customary use in Walton County entitled "The Historical Basis for Customary Use in Walton County, Florida, with reference to the Alford Property." ECF No. 70, Notice of Serving Expert Witness Disclosures. This report, however, was not attached to the Motions for Summary Judgment and is not a part of the record.

[17] The ordinance defines the dry sand area of the beach as "the zone of unconsolidated material that extends landward from the mean high water line to the place where there is marked change in material or physiographic form, or to the line of permanent vegetation, usually the effective limit of storm waves, whichever is more seaward." Walton Cty. Code at § 23-3(b).

[18] The Board also created a committee to formulate amendments to the ordinance prior to its effective date. On March 28, 2017, the Board met and adopted minor changes to the ordinance that further defined the specific allowable uses of the beach. The ordinance went into effect on April 1, 2017. *See* ECF No. 71 (stipulation as to Ord. No. 2017-10).

customary use in the state of Florida," and further noted that, based on "the research and analysis of Dr. James Miller, as well as the testimony of citizens of the County," customary use has applied to Walton County beaches "since before 1970."   Walton Cty. Code, § 23-2(a) (Ord. No. 2017-10).  The Customary Use Ordinance prohibits any "individual, group, or entity [from] impe[ding] or interfer[ing] with the right of the public at large, including the residents and visitors of the County, to utilize the dry sand areas of the beach that are owned by private entities for the uses as described in subsection (d)." *Id.* § 23-2(a).  The Ordinance specifies that the public may walk, jog, sunbathe with or without a beach umbrella, picnic, fish, build sand castles, and other similar traditional recreational activities on the dry sand area of the beach "owned by private entities." *Id.* at § 23-2(d).  The Ordinance imposes a buffer zone that prohibits public recreation within fifteen feet of the dunes or any privately owned habitable structure. *Id.* at § 23-2(c).  However, the buffer zone does not apply "to the Walton County Sheriff's Office, the Walton County Tourist Development Council, the South Walton Fire District, and other emergency service providers." *Id.*  The Customary Use Ordinance imposes a $500.00 fine for impeding or interfering with the public's use of the dry sand areas outside of the buffer zone.

## II.   Discussion

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show

that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp.*, 477 U.S. at 323). An issue of fact is material if, under the governing substantive law, it might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Where reasonable minds could differ regarding inferences to be drawn from undisputed facts, summary judgment will be denied. *See Miranda v. B & B Case Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). The evidence, and all factual inferences reasonably drawn from the evidence, must be viewed in the light most favorable to the nonmoving party, *see Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993), and credibility determinations are impermissible in this context, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

### A.    First Amendment Challenge

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amend. I. Laws that silence or suppress speech based on

the views expressed or messages represented in that speech (i.e., content-based regulations) are "presumptively invalid," regardless of the government's motive, and are subject to strict scrutiny review. *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992); *see also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015); *City of Ladue v. Gilleo*, 512 U.S. 43, 59 (1994) (O'Connor, J., concurring) ("With rare exceptions, content discrimination in regulations of the speech of private citizens on private property or in a traditional public forum is presumptively impermissible, and this presumption is a very strong one."). To survive strict scrutiny, a content-based restriction must be shown to be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Boos v. Barry*, 485 U.S. 312, 321 (1988) (quoting *Perry Education Assn. v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also R.A.V.*, 505 U.S. at 395 (noting a content-based regulation can be considered narrowly tailored only if the restriction is "*necessary* to serve the asserted compelling interest") (emphasis in original, quotation and alterations omitted).

Content-neutral restrictions on speech that impose reasonable time, place, and manner restrictions, on the other hand, are subject to intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Intermediate scrutiny requires courts to ensure that "the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

communication of the information.'" *Id.* (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Additionally, even if facially content-neutral, a law will be considered a content-based regulation of speech, subject to strict scrutiny, if it cannot be "justified without reference to the content of the regulated speech," or if the law was adopted by the government "because of disagreement with the message [the speech] conveys." *Reed*, 135 S. Ct. at 2226–27 (quoting *Ward*, 491 U.S. at 791). Thus, in evaluating the constitutionality of an ordinance restraining speech, courts first consider whether the restriction is content based or content neutral. *See id.* at 2228; *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).

The Alfords challenge the Obstruction Amendments to the Beach Activities Ordinance, Sections 22-54(g)(2)(a)(3) and 22-55, as facially unconstitutional.[19] The Alfords first argue that the Obstruction Amendments are content-based restrictions because the County's motive for enacting them was its disagreement over the content

---

[19] In Count I, the Alfords assert both a facial and an as-applied challenge to the Obstruction Amendments, as well as a claim that the Obstruction Amendments unconstitutionally burden their free exercise of religion under the First Amendment. ECF No. 43 at 8. The Alfords address only their facial challenge in the Motion for Partial Summary Judgment, and although they raise a vagueness challenge, they do so for the first time only in their Reply, ECF No. 58. The Court will not consider an argument raised for the first time in reply. *See Herring v. Sec'y, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in the reply brief are not properly before a reviewing court.") (internal citations omitted); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (noting that the doctrines of overbreadth and vagueness are distinct). In any event, because the Court ultimately finds that the Alfords are entitled to prevail on the facial free speech claim, there is no need to address any of the other claims or theories included or sought to be included in Count I.

of property owners' speech and further because the amendments restricted more speech than necessary to advance the County's interests.  The Alfords contend that the public records in evidence demonstrate that the County disfavored property owners' "no trespassing" message, and in fact, the County explored ways to chill their expression at public meetings.  Thus, they insist that the amendments were intended to target beachfront property owners.   The Court disagrees and finds no improper or content-based motive on the County's part.

As the Supreme Court has observed, the consideration of governmental motives can be "a hazardous matter."  *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968).  Specifically, when a court is "asked to void a statute . . . on the basis of what fewer than a handful of [legislators have] said about it," the "stakes are sufficiently high to eschew guesswork" because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."  *Id.*  The record in this case includes the comments of only a handful of County Commissioners at the public hearings expressing a particular hostility towards the "No Trespassing" signs.  ECF No. 53 at 23 (Commissioner Jones stated "[w]e just don't need – aesthetically we don't need those ugly fences.  We don't need those No Trespassing signs.").   Despite these remarks, the same Commissioners also expressed concerns that all signs, regardless of their content, posed public safety and aesthetic concerns, i.e. interests that are entirely justified

without reference to the content of signs.  Considering the record as a whole, the handful of comments made by less than a majority of the Commissioners does not "cast any material doubt on [the] content-neutral character" of the ordinance. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 648 (1994); *cf. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) (zoning ordinance regulating the location of adult movies theaters was content-neutral because the city's *predominate* interest was protecting against crime, preserving property values, and maintaining aesthetics, not "suppression of free expression"); *Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15cv282-MW/GRJ, 2016 WL 375102, at *3 (N.D. Fla. Jan. 28, 2016) (plaintiffs were unlikely to be successful in showing an ordinance was content based despite comments by a handful of county officials indicating special concern over a type of music because "there [was] not sufficient evidence to impute those comments to the City Council as a whole.").  Thus, although the record includes some disparaging comments about unsightly "No Trespassing" signs and discussions about the public's right of customary use, it clearly reflects that a wide range of concerns influenced and motivated the County's decision to enact the Obstruction Amendments.

Moreover, the amendments will not be considered a content-based restriction of speech merely because they may have a greater impact on beachfront property homeowners than others in the County.  "A regulation that serves purposes unrelated

to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citing *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47-48 (1986)).   A "differential impact," without more, does not demonstrate that a regulation is content-based.  *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 696 (2010).   Thus, even assuming the Obstruction Amendments disproportionately affect beachfront property owners as compared to other property owners in the County, this incidental impact affects all types of beachfront property owners equally, and it results because of concern for the beachfront nature of the property, not the viewpoint or content expressed by the signs.[20]  *See id.* (a restriction is valid if "justified without reference to the content or viewpoint of the regulated speech") (internal quotations and marks omitted).

The Alfords also argue that, even if the Obstruction Amendments are considered content neutral, they cannot survive intermediate scrutiny because the restriction of speech is facially overbroad, restricting more speech than necessary without any attempt to narrowly tailor the restrictions to the legitimate government

---

[20] The Alfords fail to acknowledge that the Beach Obstruction Ordinance also prevents vendors, who are not beachfront owners, from placing advertisement signs on the beach.  In fact, the sign ban equally restricts both commercial and non-commercial speech.  Additionally, the Beach Obstruction Ordinance impacts the County's beach signs and trash receptacles.  Noyes indicated that the Beach Obstruction Ordinance could even potentially apply to any beachgoer who had a "sign" on their cooler.

purpose.  On this ground, the Court agrees.  The restriction stated in the Obstruction Amendments is content neutral, banning as "obstructions" "ropes, chains, signs or fences."  As such, the amendments, which ban protected speech, will be upheld so long as the restriction is (1) "narrowly tailored to serve a significant governmental interest," and (2) "leaves open ample alternative channels for communication." *Buehrle v. City of Key West*, 813 F.3d 973, 978 (11th Cir. 2015).  Regarding the governmental interest, signs "pose distinctive problems that are subject to municipalities' police powers."  *City of Ladue,* 512 U.S. at 48.  In fact, the Supreme Court has expressly acknowledged that "[s]igns take up space and may obstruct views, . . . and pose other problems that legitimately call for regulation." *Id.*  It is well-settled that public safety is a significant interest. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) (describing both "traffic safety" and "the appearance of the city" as "substantial government goals").  Moreover, aesthetics, safety to County workers, and protection of endangered species were also identified as legitimate interests expressed at the public hearings.[21]  The County has a

---

[21] The amending ordinance, 2016-16, states in the preamble that obstructions on the beach, particularly fences, are a safety hazard, and also states that the amendments promote the health, safety, welfare, and quality of life of the people in the County.  While the amending ordinance did not specifically mention aesthetics, the ability of County workers to traverse the beach, and wildlife, these concerns were specifically voiced at the public hearings and County workshops, by County workers, and were subsequently articulated in the deposition of Noyes as additional bases for adoption of the amendments.  The County has offered evidence that the proliferation of signs on the beaches were ugly, unattractive, and caused clutter; restricted the ability of County code enforcement and emergency workers to traverse the beach; and could cause a "take" of an endangered species in violation of the Endangered Species Act.  *See* ECF No. 53-1 at 62, 113, and

significant and legitimate interest in regulating obstructions, including signs, as well as ropes, chains, and fences, on the beach to further these governmental interests.

However, a content-neutral time, place, or manner restriction regulating speech must be narrowly tailored such that it does not "burden substantially more speech than is necessary to further the government's legitimate interest," *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (quoting *Ward*, 491 U.S. at 799), and also must "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).  A content-neutral regulation of speech need not be "the least restrictive or least intrusive means of serving the government's interest," contrary to a content-based regulation, but a total ban may impermissibly restrict expression, placing an undue burden on speech that does not advance the government's goals.  *McCullen*, 134 S. Ct. at 2535; *see also Metromedia,* 453 U.S. at 528–30 (Brennan concurring) (concluding that "a city may totally ban [billboards] if it can show that a sufficiently substantial governmental interest is directly furthered by the total ban, and that any more narrowly drawn

---

205. The Alfords argue that the County needed concrete evidence that signs had previously caused harm or conducted a safety analysis.  The Court disagrees.  "To demonstrate the significance of its interest, the [County] is not required to present detailed evidence . . . , [but] is entitled to advance its interests by arguments based on appeals to common sense and logic." *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000) (citations omitted).  Because the County Commissioners relied on complaints from the public and employees during multiple public hearings, the County relied on sufficient evidence to advance these interests.  Thus, the Court finds that these interests are all significant governmental interests.

restriction, *i.e.*, anything less than a total ban, would promote less well the achievement of that goal"). Stated otherwise:

> [w]here certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and mean, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.

*McCullen,* 134 S. Ct. at 2534 (internal quotations omitted). Additionally, "an ordinance cannot be said to be narrowly tailored if the record shows that obvious less-burdensome alternatives were *completely disregarded*." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (emphasis added).

The Obstruction Amendments are not narrowly tailored and consequently restrict substantially more speech than necessary to achieve the County's legitimate interests. The record reflects that the County *admittedly* failed to consider any less restrictive alternatives. In fact, the County Commissioners were generally in favor of a total ban on signs because it would be "cleaner and easier to remove all things during day and night" and a total ban would avoid the difficulties of having to "parse" up the types of signs on the beach. Video Recording of June 14, 2016 Regular Meeting of the Board (ECF No. 55). Thus, rather than consider *any* less-restrictive alternatives, such as limiting the number or size of signs, the County "completely disregarded" any less-restrictive alternatives or effective alternate channels of communication merely out of administrative convenience, which does not pass intermediate scrutiny. *FF Cosmetics FL,* 866 F.3d at 1301. The First

Amendment does not condone the adoption of regulations that restrict speech out of "mere convenience." *See McCullen*, 134 S. Ct. at 2534.

Nor does the County argue that no less restrictive means exist. Although silencing all signs on the beach may have been "the path of least resistance" because it easily accomplished the County's goals, the First Amendment demands a "close fit between ends and means," which the County's total sign ban fails to do. *See id.* The County admitted that a single sign on the beach would not block County officials from traversing the beach. ECF No. 53-1 at 219. As to the legitimate interest in protecting endangered species, the County acknowledged that the concern arises primarily at night,[22] and that signs present during the day would not pose a known threat to sea turtles.[23] Even assuming that the County's legitimate interests in aesthetics and safety would strongly support a limit or even a ban of obstructions on the beach, the County's total restriction of ropes, chains, signs and fences was nevertheless not narrowly tailored to these interests because the amendments eliminated *all speech*, rather than attempting to consider a limit to the size, number,

---

[22] No lights are permitted on the beach during sea turtle season. Therefore, signs, fences, and ropes pose a hazard to officials traversing the beach at night because the officials are only allowed to use red lights that fail to illuminate items blocking their way. Additionally, the County suggests, without evidence that "takings" of a sea turtle could occur if the turtles were to bump into a sign on the beach, which would only occur at night, and return back to the water rather than lay eggs.

[23] The County identifies two other endangered species that are present on its beaches, the piping plover and the Choctawhatchee mouse; however, the County does not suggest the Ordinance is intended to further the protection of these species. ECF No. 53-1 at 161.

and timing of signs, as the County has done in the past for its Scenic Highway corridors, or other means of communicating property lines.

The County argues only that it did not need to consider limiting the ban because property owners retain alternative channels of communication on the remainder of their property. First, this argument conflates the twin elements of the content neutral analysis, which demands both a narrowly tailored restriction as well as alternative channels for communication. *See Ward*, 491 U.S. at 791. The existence of an alternative channel itself, such as the fact that other places exist on the Alfords' private property where they can post messages and erect fences, does not relieve the County of its obligation to consider less restrictive means before completely banning signs. The County has an obligation to avoid restricting speech to a greater degree than necessary.

Second, it is clear from this record that placing signs on other portions of the Alfords' property is not a reasonable alternative channel for communication of the information. Messages relating to use or ownership of the dry sand portion of the beach and intended to be conveyed directly to those traversing the Alfords' beachfront property would likely be ineffective if located on another portion of the property. In addition to the total sign ban, the County has eliminated other alternative channels of communication by means of any symbolic expression of property rights by forbidding ropes, fences, and chains. "[A] message may be

delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Clark*, 468 U.S. at 294.  This type of symbolic expression "may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the expression of free speech." *Id.*  It is not disputed that fences, ropes, and chains could be regulated on the beach, but the prohibition of this type of symbolic message together with a total sign ban and a corresponding lack of exceptions or reasonable time, place, or manner restrictions, lends weight to a conclusion that more speech than necessary is regulated by the definition of "obstruction" in the Obstruction Amendments.

Importantly, this total restriction applies to the Alfords' private property.  "A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there."  *City of Ladue*, 512 U.S. at 58 (citation omitted); *see also Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 811 (1984) (concluding that a ban on speech on public property only did not raise First Amendment concerns because "[t]he private citizen's interest in controlling the use of his own property justifies the disparate treatment"); *Warner v. City of Boca Raton*, 64 F. Supp. 2d 1272, 1291 (S.D. Fla.

1999) ("[T]he government has broader power to regulate expression on public property [than on private property]."). The County argues that it has an interest in regulating obstructions on privately owned beach property because of the public's longstanding right to use the beach. While this may be true, *see City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73, 78 (Fla. 1974) (stating the customary use right prohibits a property owner from interfering with the public's recreational use of the dry sand area of the beach), disputes over this right must be determined on a case-by-case basis, and the extent to which the customary use doctrine applies to the Alfords' property is in dispute. Even assuming that this right exists in relation to the Alfords' property, it extends only to the public's right to recreational use of the dry sand area and does not divest the property owner of private property rights. *See id.* at 78 (stating that the "right of customary use of the dry sand area of the beaches by the public does not create any interest in the land itself" and "is subject to appropriate governmental regulation"). The Court has already agreed that the County has a legitimate governmental interest in regulating obstructions on the beach. Nonetheless, the County has cited no authority to support a contention that the right of customary use provides grounds to justify a total sign and symbolic message ban without considering less restrictive alternative means for the protection of the property owners' free speech rights. Nothing about the public's customary use right itself would restrict a property owner from posting a political message, an

advertising sign, or some demarcation of the private property boundary.[24]  As such, the Obstruction Amendments are not narrowly tailored to the County's interest in protecting the public's customary use right, even assuming it exists on this portion of the beach.  The Court concludes that the Obstruction Amendments defining "obstructions," Walton Cty. Code  §§ 22-54(g)(2)(a)(3),  22-55,  are  facially unconstitutional.  In light of this conclusion, the Court has no need to address the Alfords' First Amendment overbreadth or as-applied arguments, which are moot.

Finally, the County argues that, even if a portion of the Obstruction Amendments are found unconstitutional, the Ordinance as a whole should not be stricken because it contains a broad severability provision that would permit the survival of any portion of the Ordinance that survives a court challenge.  The Court agrees.  The Beach Activities Ordinance provides that "[i]f any portion of this Ordinance is determined by any Court to be invalid, the invalid portion shall be stricken, and such striking shall not affect the validity of the remainder of this Ordinance."[25]  Ord. No. 2016-16.  The Eleventh Circuit has recognized that courts

---

[24] To the extent a "no trespassing" sign could impermissibly exclude the public from recreational use in an area where the public right of customary use has been established is not addressed in the Obstruction Amendments, which simply ban all signs, fences, ropes and chains from all areas of the dry sand beach, with no exceptions or time, place and manner limitations. The public record shows that the County chose to ban all speech and messages without considering whether this ban was narrowly tailored to its legitimate interest.  Moreover, even assuming a customary use right exists, there still may be valid reasons to mark a property line, as shown by the public discussions about the Sheriff's SOPs.

[25] Additionally, the Walton County Code § 1.7, Severability of Parts of Code, provides: "[I]f any section, subsection, sentence, clause, phrase or portion of this Code or any ordinance is

have an obligation to uphold legislative enactments by striking "only the unconstitutional portions," where possible, and that "Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones." *Solantic*, 410 F.3d at 1269 n.16 (quoting *Coral Springs Street Sys, Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004)). The Florida Supreme Court requires the following severability analysis:

> When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

*Coral Springs*, 371 F.3d at 1347.

The Court finds that the Obstruction Amendments can be separated from the Beach Activities Ordinance. Striking § 22-54(g)(2)(a)(3), which states that no permits can be given for "[o]bstructions, including but not limited to ropes, chains, signs or fences," preserves the basic prohibition in subsection (g) against leaving personal property on the beach between one hour after dusk and one hour after sunrise, unless a permit has been granted, Walton Cty. Code § 22-54(g)(1), and also

---

for any reason declared to be unconstitutional, inoperative, or void, such holding or invalidity shall not affect the remaining portions of this Code or any ordinance."

preserves the other permitting provisions and restrictions found in § 22-54(g)(2). Similarly, striking the definition of "obstruction" from § 22-55 (the sentence, "Obstructions include, but are not limited to ropes, chains, signs, or fences.") leaves intact the general prohibition of obstructions on the beach, although the term "obstructions" is left undefined.  However, the Court finds that, for purposes of the third prong of the severability analysis, striking only part of the definition itself (such as, only the word "signs") would parse the amendments too narrowly.  It cannot be said that the County would have passed the one without the other because, in fact, a vote was taken on a version of the amendments that omitted the word "signs" and included only fences, ropes, and chains, but the Board rejected the proposal.  Thus, the entire definition as drafted will be stricken and severed from both sections of the Beach Activities Ordinance.

This in no way leaves the County unable to revisit the issue and craft a new definition with reasonable time, place and manner restrictions to accomplish the County's legitimate public purposes without imposing a total ban on signs and other symbolic speech.  *See City of Ladue*, 512 U.S. at 58 (stating the Court's decision that a total sign ban was unconstitutional "by no means leaves the City powerless to address the ills that may be associated with residential signs").  The Court is "confident that more temperate measures could in large part satisfy [the County's] stated regulatory needs without harm to the First Amendment rights of its citizens."

*Id.*  The Alfords are entitled to summary judgment on Count I and a declaration that the definition of "obstructions" in Walton County Code §§ 22-54(g)(2)(a)(3) and 22-55 is unconstitutional and stricken from the Beach Activities Ordinance.  Moreover, in light of this conclusion, the Substantive Due Process challenge of Count II, seeking only declaratory relief, and the state law claim that the Obstruction Amendments are inconsistent with state law statutes in Count III are moot.

### B.    Motion to Exclude

The County moves to exclude certain references by Plaintiffs' attorneys in their reply brief, which the County asserts improperly insinuated that the County might have violated the Florida Sunshine Law and improperly referenced the County's assertion of attorney-client privilege during a deposition of the County Attorney.  The Alfords respond that these references are neither false nor irrelevant, that they did not, in fact, accuse the County of violating Florida's Sunshine Law, and that the references were merely made in response to the County's attempt to "distance itself" from comments made by the Assistant County Attorney who was designated as a corporate representative.  ECF No. 60 at 2.   The Court did not reference or rely on these comments or draw any adverse inferences from them in determining the motion for summary judgment on Count I.  Therefore, the motion to exclude is moot.

### C.    Customary Use Ordinance

Because of the Court's ruling on Count I, all federal issues in this case have been resolved, and no counterclaims have been raised.  The only remaining claim is Count IV, challenging the Customary Use Ordinance on state law grounds as an *ultra vires* act of legislation.   A court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c).  The Supreme Court and Eleventh Circuit encourage district courts to dismiss remaining state law claims when the federal claims have been dismissed prior to trial.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). Count IV raises issues of particular significance to the state of Florida, namely, the home rule and legislative authority of a county regarding the customary use doctrine as it relates to the intersect of private property and the public's recreational use of Florida's beaches.  These important and unique issues of state property law and legislative authority would be best adjudicated by Florida's state courts.[26] Therefore, the Court declines to exercise supplemental jurisdiction over the remaining state law claim and will dismiss Count IV without prejudice for the parties to raise it in state court.  The pending cross-motions for summary judgment on Count IV are moot.

---

[26] The Customary Use Ordinance only became effective as of April 1, 2017.

Accordingly:

1.      Plaintiffs' Partial Motion for Summary Judgment on Count I, ECF No. 53, is **GRANTED.**  Plaintiffs are entitled to judgment declaring as follows:

The Obstruction Amendments to the Walton County Code, namely, § 22-54(g)(2)(a)(3), to the extent it defines "obstructions [as] including but not limited to ropes, chains, signs, or fences," and § 22-55 to the extent it states, "Obstructions include, but are not limited to ropes, chains, signs, or fences," are facially unconstitutional in violation of the First Amendment and are stricken.

2.      In light of the ruling on Count I, the Court finds that Count II and Count III are **MOOT** and **DISMISSED without prejudice**.

3.      The Court declines to exercise supplemental jurisdiction as to the remaining state law claim, and therefore, Count IV is **DISMISSED without prejudice**.

4.      The Alfords' Partial Motion for Summary Judgment on Count IV, ECF No. 44, and the County's Partial Motion for Summary Judgment on Count IV, ECF No. 61, are **MOOT**.

5.      The County's Objection and Motion to Exclude Reference, ECF No. 59, is **MOOT**.

6.      The Clerk is directed to enter judgment accordingly and close the file.

7.   Costs to be taxed against Defendant.

**DONE AND ORDERED** this 26th day of September, 2017.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**